[No. 734.   October 2, 1897.]

JOSEPH BARNETT, Appellant, v. BESSIE BARNETT, Appellee.

HUSBAND AND WIFE—ACQUEST PROPERTY.—In the absence of any statute of this territory ascertaining the rights of husband and wife, after legitimate separation and during the lives of both, to the property acquired during the coverture, and of any change in the Spanish law as to such property under such status, that law upon the subject, in force at the date of the treaty of cession, must govern.

ID.—COMMUNITY PROPERTY—RIGHTS OF WIFE—FORFEITURE.—While, under the Spanish law, the wife is entitled to one-half of the acquest or community property on the death of her husband, by commission of the act of adultery she forfeits that right.

ID.—PROPERTY RIGHTS—DECREE OF DIVORCE—RES ADJUDICATA.—A decree divorcing husband and wife bars any subsequent action by either against the other to enforce any right growing out of the marital relations.

*Appeal*, from a decree for complainant, from the Second Judicial District Court, Bernalillo County. Reversed and remanded, with directions.

The facts are stated in the opinion of the court.

CHILDERS & DOBSON for appellant.

Under the Mexican and Spanish law the wife had no vested interest in the community property until a dissolution of the marriage community. Packard v. Arellanes, 17 Cal. 539; Ball on Com. Prop., secs. 32-35; Schmidt's Civil Law,

art. 51; App. to Ball on Com. Prop. 396; Van Moren v. John-
son, 15 Cal. 308; Platt on Prop. Rights of Married Women,
sec. 38.

Under the Spanish and Mexican law the wife by adultery
forfeited all interest in the community property.  The widow
likewise forfeited her portion of the matrimonial gains by
leading a dissolute life.  Schmidt's Civil Law, 396-398, secs.
55, 61-68.

The Spanish and civil law is in force in this territory at
the present time with reference to the respective parties
upon a dissolution of the marriage relation; and the acts of
1889 with reference to "Descent and Distribution" relates to
settlement of community rights where the marriage is dis-
solved by the death of one of the spouses.  In re Buchanan's
Estate, 8 Cal. 507.

The decree rendered in favor of the husband, granting
him a divorce from the wife, is res adjudicata as to her prop-
erty rights in the community property.  Cromwell v. Soc. Co.,
94 U. S. 351-358; 21 Am. and Eng. Ency. of Law, 220; Chou-
teau v. Gibson, 76 Mo. 38; Bryan v. Kennett, 113 U. S. 179;
Roe v. Roe, 35 Pac. Rep. 808; Thompson v. Thompson, 31
N. E. Rep. 529.

Patterson & Wallace and Johnson & Finical for
appellee.

While they differ in some minor respects, the principle
underlying the various statutory adoptions of the civil law in
relation to the community system in the several states and
territories is the same, viz.: the equal sharing of husband and
wife in the property acquired during the marriage.  Ball.
Com. Prop., sec. 36; Edwards v. Brown, 4 S. W. Rep. 380;
Kircher v. Murray, 54 Fed. Rep. 617.

By the Laws of 1876, Comp. Laws, 1884, sec, 1823, the
common law was adopted as the rule of practice and decision
in this territory.  Browning v. Browning, 3 N. M. 675;
Walker v. R. R. Co., 165 U. S. 17 Sup. Ct. 125.

If the legislature of New Mexico had enacted that part of the community system which deprives the wife of her portion of the acquest property if she commits adultery, it would be contrary to the constitution of the United States as depriving her of her property without due process of law.    Const. U. S., 5 Amend.

. See, also, Godey v. Godey, 39 Cal. 157; House v. Williams, 40 S. W. Rep. 414; Hensley v. Lewis, 17 Id. 914; Ball. Com. Prop., secs. 202, 209.

It seems now to be universally held that the property rights of the spouses may be determined after divorce has been granted, where the decree granting the divorce is silent on that question.    Ball. Com. Prop., sec. 209; Whetstone v. Coffee, 48 Tex. 276; Harvey v. Cummings, 5 S. W. Rep. 513; Edwards v. Brown, 4 Id. 380; Grattan v. Weber, 47 Fed. Rep. 850; Godey v. Godey, 39 Cal. 157; House v. Williams, supra; 17 Am. and Eng. Ency. of Law, 693; Ross v. Ross, 26 Pac. Rep. 1007; Kirchner v. Dietrich, 42 Id. 1064.    See, also, Lessee of McCall v. Carpenter, 18 How. 297; Packet Co. v. Sickles, 5 Wall. 580.

SMITH, C. J.—This is a suit brought by Bessie Barnett against Joseph Barnett for a partition or division of all real and personal property standing in the name of or owned by appellant, and alleged to be community property, and acquired during the marriage relation formerly existing between the said parties.    The said appellant procured a divorce from appellee on the fifth day of November, 1894, and this suit was brought on the thirteenth day of · January, 1896. Said bill of complaint alleges that appellant and appellee were married on or about the tenth day of August, 1891; that, at the time they were married, the appellant possessed and owned no property by inheritance, donation, or legacy during the existence of the marriage community, but that they did acquire a large amount of property, both real and personal, by their joint and separate efforts and labors, as set forth and described in the bill of complaint, and. alleges that all said

property is acquest and community property, and that appellee
is entitled to one-half interest in and to the same.    Appellant
filed a demurrer to the said bill, which was overruled, and
thereafter appellant filed an answer, and referred to and made
the pleadings in the divorce suit a part thereof, and denied that
the appellee was entitled to any interest in either the real or
personal property.    Issue was joined, and Ad. H. Wycoff was
appointed special master to take the testimony therein, and
report the same to the court, with his opinion thereon.    There-
after appellee asked leave to amend her bill of complaint,
alleging the date of her marriage to appellant in 1887, instead
of 1891, which leave was granted, and thereafter defendant
and appellant filed an amended answer.    After the evidence
was taken, the master made his report, sustaining the allega-
tions in the bill of complaint, finding in favor of complainant
and appellee, and that the property, real and personal, owned
and possessed by appellant, was acquest and community prop-
erty, and found the value of the real estate to be $13,250, and
the personal property of the value of $7,500, and that appellee
was entitled to one-half of the same, together with the further
sum of $175, for money borrowed by appellant from appellee.
Exceptions to said master's report were filed, and by the court
overruled, to the overruling of which defendant excepted, and
still excepts. Final decree was rendered, and appellant prayed
an appeal, and gave a supersedeas bond to stay execution of
said decree.

     Assignments of error:    "Now comes the appellant in the
above entitled cause, and assigns as errors committed by the
court below the following, to wit:    (1)    The court erred in
overruling defendant's demurrer to the bill of complaint
therein.    (2)    The court committed error in approving the
findings of law contained in the master's report.    (3)    The
court committed error in approving the findings of fact con-
tained in the master's report.    (4)    The court committed error
in overruling the appellant's exception to the master's findings
of law and fact.    (5)    The court committed error in holding
that the decree divorcing the appellant from the appellee was

not a complete bar to any claim of property rights made under the bill of complaint filed in this case. (6) The court committed error in refusing to hold that the appellee having been adjudged, in the decree rendered in the suit for divorce, guilty of adultery, such fact did not forfeit all her rights in the property belonging to the marriage community thus dissolved. (7) The court committed error in holding that the appellee had any rights in the property belonging to the said marriage community which she could enforce prior to the death of the husband."

It will not be contended that the appellee became vested with any separate interest under the common law in the property of the appellant acquired during their coverture, and it is not less assured that there is no provision made for her during his life as to such property by any statute of the territory. Chapter 90 of the Acts of 1889 is "An act to amend the laws relative to the estates of deceased persons," and directs that "one-half of the acquest property which remains after the payment of the common debt shall be set apart to the surviving husband or wife absolutely." It is manifest that this distribution is derived from the Spanish law, and it may be that the limitation as to the time of the operaton was suggested by the same code. It is consequential, therefore, that, if any laws have obtained here disposing (during the life of husband and wife) of the property accumulated by them during the continuance of their marriage relation, they are those of Spain and Mexico, as they existed, concerning descents, distributions, wills, and testaments, when this territory became a part of the United States. In 1846 the following announcements were promulgated by Kearney in his Code: Kearney's Code, p. 82, sec. 1. (September 22, 1846): "All laws heretofore in force in this territory, which are not repugnant to or inconsistent with the constitution of the United States, and the laws thereof, or the statute laws in

HUSBAND and wife: acquest property: law governing.

force for the time being, shall be the rule of action and decision in this territory." Kearney's Code, Pamph., p. 35, sec. 1 (September 22, 1846): "The laws heretofore in force concerning descents, distributions, wills and testaments, as contained in the treatises on these subjects written by Pedro Murillo De Lorde (Velarde), shall remain in force so far as they are in conformity with the constitution of the United States and the state laws in force for the time being." The following, as to the foregoing, was duly enacted and incorporated in the Compiled Laws of 1865 (Act July 14, 1851, Pamph., p. 176, sec. 6): "That all laws that have previously been in force in this territory that are not repugnant to, or inconsistent with the constitution of the United States, the organic law of this territory, or any act passed at the present session of the legislative assembly, shall be and continue in force, excepting in Kearney's Code the law concerning registers of land." Section 1, as above, of the Compiled Laws of 1865, is repeated in the Compiled Laws of 1884, as section 1365, as below: "Sec. 1365. The laws heretofore in force concerning descents, distributions, wills and testaments, as contained in the treatises on these subjects written by Pedro Murillo De Lorde (Velarde), shall remain in force so far as they are in conformity with the constitution of the United States and the state laws in force for the time being." The sequence of proceeding, and the absence of other legislation on the subject until 1887, establish that the civil law as to descents, distributions, wills and testaments obtained here in 1846, and prevailed continuously unmodified to the time of the passage of the "Act regulating descents and the apportionment of estates," approved February 24, 1887, and in force from its passage. This statute expressly repealed all laws in force contravening its provisions, but it does not positively or by implication affect during the lives of husband and wife the acquest property, or direct its disposition until the death of either. An act that became a law February 26, 1889, supersedes the statute of 1887, above cited, but is likewise silent as to acquest property as long as the members of

the marital partnership are both alive, though divorced. In 1891, section 1365 of the Compiled Laws of 1884 was repealed as follows: "Be it enacted by the legislative assembly of the territory of New Mexico: Section 1. That section 1365 of the Compiled Laws of the Territory of New Mexico of 1884, relating to administrations be and the same is hereby repealed." Notwithstanding the inaptness of the phraseology of the above act, we will presume that its object was to repeal section 1365, and will consider it as though such effect were indisputable. If the laws concerning descents, distributions, wills and testaments contained in the treatises on these subjects written by Pedro Murillo Velarde are not now in force to the extent that they are not positively supplanted, the conclusion that there is not extant in the territory any provision as to the rights of husband and wife, while both are alive, to acquest property, is irresistible. The common law recognizes no interest in the wife during coverture because of separation. Our statutes are equally deficient as to such status and inevitably the defendant in error is remanded to the civil law for protection, if she is worthy of it.

We will now inquire whether the civil law as to acquest property during the lives of the parties who have contracted marriage, and been divorced, has been abolished in New Mexico. It is a recognized tenet of international law that, in the annexation of new territory, its jurisprudence as to rights—not political in character—of its people are acquired with it, and remain in force until substituted by action of the new sovereignty. Says Chief Justice Marshall, in Insurance Co. v. Canter, 1 Pet. 544: "It has been already stated that all the laws which were in force in Florida while a province of Spain, those excepted which were political in their character, which concerned the relations between the people and their sovereign, remained in force until altered by the government of the United States. Congress recognizes this principle, by using the words 'laws of the territory now in force therein.' No laws could then have been in force but those enacted by the Spanish government." The same illustrious expounder,

in U. S. v. Percheman, 7 Pet. 82, declares that "the people change their allegiance; their relation to their ancient sovereign is dissolved; but their relations to each other, and their rights of property, remain undisturbed." In Mitchell v. U. S., 9 Pet. 729, Mr. Justice Baldwin, delivering the opinion, announced "that by the law of nations, the inhabitants, citizens or subjects of a conquered or ceded country, territory or province retain all the rights of property which have not been taken from them by the orders of the conqueror, or the laws of the sovereign who acquires it by cession, and remain under their former laws until they shall be changed." Mr. Justice Field, in Railway Co. v. McGlinn, 114 U. S. 546, elaborates as follows: "It is a general rule of public law, recognized and acted upon by the United States, that, whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country—that is, laws which are intended for the protection of private rights—continue in force until abrogated or changed by the new government or sovereign. By the cession, public property passes from one government to the other, but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment. As a matter of course, all laws, ordinances and regulations in conflict with the political character, institutions and constitution of the new government are at once displaced. Thus, upon a cession of political jurisdiction and legislative power (and the latter is involved in the former) to the United States, the laws of the country in support of an established religion, or abridging the freedom of the press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use and transfer of property, and designed to secure good order and peace in the community and promote its health and prosperity which are

strictly of a municipal character, the rule is general that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed."

That no statute of this territory—either that adopting the common law as the rule of practice and decision, or that relative to the estates of deceased persons, or any other enactment—ascertains the rights of husband and wife after legitimate separation, and during the lives of both, to the property of which they became possessed during coverture, has been shown; that a casus omissus has thus eventuated will be recognized; that any change of the Spanish law as to the acquest property under the foregoing status has been made can not be seriously pretended; and that the foregoing authorities decisively establish that, in such contingency, the law upon the subject in operation at the date of the cession of the territory must prevail, should be unhesitatingly admitted.   "Under the Spanish and Mexican law, property acquired by the husband and wife during the marriage, and whilst living together, whether by onerous or lucrative title, and that acquired by either of them by onerous title, belonged to the community; whilst property acquired by either by lucrative title solely constituted the separate property of the party making the acquisition.   The fruits, profits and increase of the separate property also belonging to the community.   By 'onerous title' was meant that which was created by valuable consideration, as the payment of money, the rendition of services, and the like, or by the performance of conditions or payment of charges to which the property was subject. 'Lucrative title' was created by donation, devise or descent." "The wife, under the Mexican law, was clothed with the revocable and feigned dominion and possesion of one-half of the property acquired by her and her husband during the coverture.   During this period the husband is the head of the community, and the law invests him with discretionary power in all matters pertaining to its business or property.   In fact, its business is conducted and its property acquired in his name, and his authority in the administration of its affairs is exclu-

sive and absolute. The wife has no voice in the management of these affairs, nor has she any vested or tangible interest in the community property. The title to such property vests in the husband, and for all practical purposes he is regarded by the law as the sole owner. It is true, the wife is a member of the community, and is entitled to an equal share of the acquests and gains, but not so long as the community exists; her interest is a mere expectancy, like that which an heir possesses in the estate of an ancestor, and possesses none of the attributes of an estate, either at law or equity." It can not be that the wife, being subordinate during coverture, becomes an equal, with equal rights as a feme sole to the property. Powerless during marriage, she must be divested absolutely by divorce, a termination of the marital rights in relation to the community property. It appears in "Practico de Testamento," published by Pedro Murillo De Velarde, as follows: "Sec. 12. Of the Surviving Consort. To the surviving consort the laws have conceded a certain right in the property of his consort, and at the same time have imposed upon him certain obligations, which it has seemed convenient to collect and explain in this section. First, The surviving consort has a right to the half of the ganancial (1) property acquired during matrimony. This right is based on the community or legal partnership existing between those married, as the civil effect of the marriage. It does not hold in case of divorce, because the consort who gave cause therefor loses the right to the ganancial property; nor in case of apostacy of either of them; and although, by ancient law, it was lost through the crime of treason, the penalty of confiscation, which followed from it, and was the cause of that loss, being abolished by our constitutional law, the rights subsists. The widow who lives unchastely also loses it, in favor of the heirs of her husband." Says Ballinger in his treatise on Community Property: "Upon the dissolution of the community by death or legal separation, the ganancias are to be divided equally." Says the same author: "The wife forfeits her matrimonial gains when she has been

Community property: rights of wife: forfeiture.

guilty of adultery or abandoned her husband without his consent." Says Schmidt in his publication of the law of Spain and Mexico, in article 68: "The wife loses her matrimonial gains in the following cases: (1) When she has been guilty of adultery; (2) when she has abandoned her husband without his consent; (3) when she has joined some religious sect, and then married or committed adultery." Says Hall in his work on Mexican Law (section 3081), in specifying those incapable of acquiring because of crime: "(4) The wife condemned as an adulteress in the life of her husband, if the question shall be of the succession of the legitimate children had by the marriage in which she committed the adultery."

It is apparent that the civil law is emphatic in its condemnation of the crime of adultery by the wife; that it is condign in the severity of its punishment for such an offense; and that the defendant in error must be one of the victims of its policy. That there has been no modification in the Spanish code of the requirement of fidelity by the woman in the marital relation, nor any abatement of the penalty imposed upon her for her dissoluteness, must be commended; but that it should be less exacting of the husband, and less proscriptive of him for his unchastity, seems a reproach that can not be too vigorously denounced. That men, the lawmakers, should impose upon the other sex penalties for their misdeeds greater than those they attach to themselves for similar misconduct, is a gross prostitution of power, and a flagrant perpetration of a wrong that is a shame to them, and most pernicious in its demoralizing effects upon society. They who arrogate to themselves superiority, and assume to manufacture public sentiment, should not only refrain from invidious discrimination against women for the violation of their marital obligations, but should so exalt the standard of morality by scrupulous propriety and abstinence from impurity as husbands that they could, by example, demand fidelity from their wives. If men were constrained to purity in fealty to those to whom they have pledged themselves, the latter, in appreciative devotion, would be

unyielding to temptation, and the relation of matrimony no longer a partnership increasing in frequency of dissolution.

We realize that we might have forborne the foregoing investigation, as we do not doubt that the plaintiff in error is impregnable in his defense of res adjudicata, but we have deemed it due to counsel to consider with care their respective contentions. It is wisdom that forbids the multiplication of litigation on the same subject, and spares suitors needless vexation in the determination of their rights. The parties to this controversy, having been separated by final decree of a court of competent jurisdiction are estopped from further harassing each other as consorts in any other tribunal. The marital status having ceased absolutely, no rights which accrued in or by virtue of such relation, and were not asserted in the proceedings for dissolution, can be subsequently maintained. An absolute divorce, or a divorce a vinculo matrimonii, or from the bonds of marriage, absolutely dissolves all marriage ties, and destroys the relation of husband and wife. After the date of the decree the man has no wife, the woman no husband. The woman is a feme sole. A decree which dissolves the marriage absolutely, and destroys the marriage status, puts an end to all rights dependent upon coverture. After such a decree, the court has no jurisdiction over the parties, and the suit is no longer pending. When the court has entered the final decree, it has no further jurisdiction over the subject-matter, and can not reassume it.

Says the Supreme Court of the United States, in Aurora City v. West, 7 Wall. 102: "Courts of justice, in stating the rule, do not always employ the same language; but where every objection urged in the second suit was open to the party, within the legitimate scope of the pleadings in the first suit, and might have been presented in that trial, the matter must be considered as having passed in rem judicatam, and the former judgment in such a case is conclusive between the parties. Except in special cases, the plea of res judicata, says Taylor, applies not only to points upon which the court was actu-

*Marginal note:* HUSBAND and wife: property rights: decree of divorce: res adjudicata.

ally required to form an opinion and pronounce judgment, but to every point which property belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." Says the same paramount authority, in Beloit v. Morgan, 7 Wall. 622: "The court had full jurisdiction over the parties and the subject. Under such circumstances, a judgment is conclusive, not only as to the res of that case, but as to all further litigation between the same parties touching the same subject-matter, though the res itself may be different. *  *  * But the principle reaches further. It extends not only to the questions of fact and of law which were decided in the former suit, but also to the grounds of recovery or defense which might have been, but were not presented. In Henderson v. Henderson, 3 Hare, 115, the vice chancellor said: 'In trying this question, I believe I state the rule of the court correctly that, where a given matter becomes the subject of litigation in and adjudication by a court of competent jurisdiction, the court requires the parties to bring forward their whole case, and will not, except under special circumstances, permit the same parties to open the same subject of litigation in respect of a matter which might have been brought forward as a part of the subject in contest, but which was not brought forward only because they have, from negligence, inadvertence, or even accident, omitted a part of their case. The plea of res judicata applies not only to the point upon which the court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.'" In Le Guen v. Gouverneur, 1 Johns. Cas. 491, Radcliff, J., says: "The general principle that the judgment or decree of a court possessing competent jurisdiction shall be final as to the subject-matter thereby determined is conceded on both sides, and can admit of no doubt. The principle, however, extends further. It is not only final as to the matter actually determined, but as to every other matter which the parties might litigate in the

cause, and which they might have had decided. The reasons in favor of this extent of the rule appear to me satisfactory. They are founded in the expedience and propriety of silencing the contentions of parties, and of accomplishing the ends of justice, by a single and speedy decision of all their rights. It is evidently proper to prescribe some period to controversies of this sort; and what period can be more fit and proper than that which affords a full and fair opportunity to examine and decide all their claims? This extent of the rule can impose no hardship. It requires no more than a reasonable degree of vigilance and attention. A different course might be dangerous, and often oppressive. It might tend to unsettle all the determinations of law, and open a door for infinite vexation. This reasoning is founded in good sense, and supported by the weight of authority. It is equally applicable to the court of chancery as to any other court." "A late case in Wisconsin (1867) affirms the rule thus: 'The rule to be derived from these cases is that the decision of a court of competent jurisdiction, being res judicata, is not only conclusive and binding on all other courts of concurrent jurisdiction as to the subject-matter thereby determined, but also as to every other matter which the parties might litigate in the case, and which they might have had decided.' And in no case can one be heard to complain that a judgment was rendered against him in consequence of his own neglect or unskillfulness in developing the proper issues for the decision of the court." In Bates v. Spooner, 45 Ind. 493, is the following statement: "When a matter is adjudicated and finally determined by a competent tribunal, it is considered as forever at rest. This is a principle upon which the repose of society materially depends, and it therefore prevails, with very few exceptions, through our civilized world. This principle not only embraces what actually was determined, but also extends to every other matter which the parties might have litigated in the case." In Foster v. Wells, 4 Tex. 101, it is observed: "It seems that a judgment is not only final as to the matter actually determined, but as to every other matter which the parties

might litigate in the cause, and which they might have had
decided." It is recognized in Thompson v. Thompson (Ind.
Sup.), 31 N. E. 530, that in a suit for divorce all the property
rights between the husband and wife were settled by the de-
cree in that case, and that not only what was in fact litigated,
but what might have been litigated by such litigation, is
settled by the adjudication. In Fischli v. Fischli, 12 Am.
Dec. 251, it is said: "A judgment or decree obtained in
another state is conclusive here as to all matters which were
or might have been there adjudicated. Hence a decree of
divorce in Kentucky, in which alimony was allowed, concludes
the wife from applying in this state [Indiana] for a further
provision, although such original allowance was insufficient."
In Kamp v. Kamp, 59 N. Y. 212, wherein a final judgment
was perfected in favor of plaintiff granting a divorce a vinculo,
but allowing no alimony, the court says: "The jurisdiction of
the court over the subject-matter of the action, and over the
parties, in respect to all matters involved in it, terminated
with the entry of final judgment therein, except to enforce the
judgment and carry out its provisions, or to correct any mis-
takes in the record, upon proper application, made within a
reasonable time. The parties from that time were no longer
husband and wife, and had no claims upon each other growing
out of the relations before existing between them, except such
as were given by the judgment. The court had adjudged
that the plaintiff was not entitled to alimony. The law pre-
sumes that every question involved in the action (and the right
of the plaintiff to alimony was one of the questions) was
passed upon by the courts, and the claim to alimony, if made,
was decided adversely to the plaintiff, and the adjudication
was final. The judgment was final, not only as to the matter
actually determined, but as to every other matter which the
parties might litigate in the case, and which they might have
had decided. The plaintiff was effectually precluded from
all claim to alimony by the judgment. The court then lost
jurisdiction over the person of the defendant for every pur-
pose, except so far as might be necessary to enforce the judg-

ment actually given." In Hardin v. Hardin, 38 Tex. 617, the court declares that "in a suit for divorce all questions of property between the parties should be settled. If not then settled, they are considered waived, and such waiver is final." In Roe v. Roe, (1894; Kan. Sup.) 35 Pac. 809, Allen J., states and decides that, "under the law of Kansas, the court rendering judgment in an action for divorce is authorized, on a proper showing, to grant alimony, whether the divorce be allowed, or not. If the divorce is granted, it operates as an absolute dissolution of the marriage tie. Whatever orders with reference to alimony or a division of the property are desired by either party may then be considered and determined by the court. If they may be so considered and determined, and a party neglects to require such determination, the judgment is as full and complete a bar as if the question had been fully tried and determined." In Greene v. Greene, 2 Gray, 361, at page 365, it is declared that "it is no good exception to show that the matter now offered did not in fact come in question. Such an exception, as said by the chief justice in Homer v. Fish, 1 Pick. 441, would render the rule nugatory. It is sufficient that the action was of a nature to admit of such a defense, and that the plaintiff in the new suit might have availed himself of it." In Dookey v. Kalee Pershad, 8 W. R. 366, Phegar, J., said: "The necessity of putting some termination to litigation is the foundation of the rule that any issue which is material to the rights of the parties in the matter of suit between them, whether actually contested or not, shall not afterwards be raised in a subsequent suit between the same parties." In Stahl v. Stahl, 114 Ill. 375, it is held that, "where a wife procures a divorce from her husband, the court is authorized to make disposition as to the homestead; but, if the court fails to do this, the relation of husband and wife being severed by the decree of divorce, the latter loses all claim to a homestead, so that the husband may sell the premises without her release of homestead right." It appears that a husband is similarly affected by res adjudicata. In Patton Loughridge, 49 Iowa 218, it is decided: "A claim of the

husband for property of which he has been defrauded by the wife will be presumed to have been adjudicated in an action by the wife for divorce, in which a decree allowing alimony was granted; and he can not afterwards maintain an action on the claim against a party by whose alleged instrumentality the fraud was effected." In Mott v. Mott, 82 Cal. 413, is the following: "The settlement of property rights is incident to every action for divorce when there is any property involved, and such settlement may be brought in the cross complaint, as well as in the original complaint."

It is inconceivable that the established principle, "Interest republicae ut sit finis litium," could be more authoritatively sustained or more emphatically exemplified and vigorously vindicated, and that there could be no complication to which it could with greater propriety be applied is easily perceptible. The defendant in error, in humiliation, it must be presumed, at her conscious iniquity, refrained from resistance to the demand of her husband, and, in acquiescence, not only confessed the accusation, but approved the redress prayed, and recognized that she had forfeited all claim to any benefit from the partnership, the articles of which she had infamously violated. Associated upon terms that imposed conjugal fidelity, it was to her credit that, having been false to her obligations, she forbore the assertion of any interest in the affairs of the union during the progress of the proceedings for divorce; and it would have been seemly if, after the termination of the marital relations for her criminality, she had suppressed the manifestation of her covetousness in the attempt to profit by her own wrong. We conclude that as the defendant in error, by her own immorality, forfeited any interest in the property of her husband under the civil law, and as she permitted the dissolution of her marital relations without any demand for any provision for her in the proceedings for divorce, she is without any legal claim against her husband for any of the property acquired by them during their coverture. The decree of the lower court must therefore be

reversed and remanded, with directions to lower court to dismiss the bill, and it is so ordered.

Laughlin, Hamilton and Bantz, JJ., concur.